1   Riley Grace Borden
    (WA Bar No. 62029)
2   INSTITUTE FOR JUSTICE
    600 University Street, Suite 2710
3   Seattle, WA 98101
    (206) 957-1300
4
    Jeff Rowes*
5   (TX Bar No. 24104956
    Christen Hebert*
6   (TX Bar No. 24099898)
    INSTITUTE FOR JUSTICE
7   816 Congress Avenue, Suite 970
    Austin, TX 78701
8   (512) 480-5936

9   *pro hac vice motions to be filed

10              **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF WASHINGTON**
11                   **SPOKANE DIVISION**

12  LIGHTHOUSE CHRISTIAN MINISTRIES,

13          *Plaintiff*,                    Case No.  2:25-cv-00507

14  v.                                      **COMPLAINT**

15  CITY OF WENATCHEE,

16          *Defendant*.

17

18

19

**COMPLAINT - 1**

1.    Plaintiff Lighthouse Christian Ministries challenges the City of Wenatchee's unconstitutional revocation of Lighthouse's conditional use permit to operate a soup kitchen from its property. Lighthouse brings this civil-rights action to vindicate its rights under the United States Constitution and restore its ability to use its property to feed the hungry.

## INTRODUCTION

2.    For six years, Lighthouse served as a critical lifeline for Wenatchee's most vulnerable residents—feeding the hungry, providing a daytime refuge to the City's most vulnerable residents, and serving as a hub for the region's social-service network at its 410 South Columbia Street property. Lighthouse operated its soup kitchen in a manner consistent with its City-approved management plan, worked closely with the City's own homeless-services administrator, and coordinated with the police to address problematic behavior by the guests that the soup kitchen served. Nothing in Lighthouse's operations resembled mismanagement.

3.    Lighthouse's ability to operate its soup kitchen on its property depended on a conditional use permit that it had secured from the City in 2016. Under Wenatchee's ordinances and Washington law, that CUP was a vested property right running with the land, not a temporary privilege. Only after obtaining the CUP did Lighthouse invest more than a million dollars renovating the vacant warehouse at 410 South Columbia Street into a soup kitchen and relocating its operations from

COMPLAINT - 2

one of Wenatchee's main downtown thoroughfares where the soup kitchen had run for nearly a decade.

4. Yet in 2025—without prior notice, without issuing any citation, and without offering Lighthouse any opportunity to address the City's alleged concerns—the City abruptly revoked the CUP, forcing the Lighthouse to shut down its soup kitchen. To justify this extraordinary action, the City pointed to trivial, easily fixable issues, misrepresented public service call data, and improperly attributed to Lighthouse every complaint or incident occurring anywhere in the surrounding blocks, including conduct Lighthouse could not legally or practically control.

5. The City's deliberate misrepresentation of public service call data is so blatant and so comprehensive that none of its assertions are trustworthy. The City erroneously blamed Lighthouse for nearly 2,000 emergency service calls in the surrounding area without any basis for doing so, faulting Lighthouse for incidents that bore no connection to Lighthouse, such as by including routine police responses to car accidents at a nearby busy intersection. The misuse of call data is so obvious that the only explanation is that the City was deliberately manufacturing false justifications for shutting down Lighthouse.

6. The real reason for the revocation was political. A small group of influential property owners near the soup kitchen demanded that the City shut it down. So the City did, manufacturing justifications to strip Lighthouse of its vested

COMPLAINT - 3

right to operate its soup kitchen. Rather than acknowledge that it was caving to political pressure, the City blamed Lighthouse for offsite conduct that Lighthouse could not control and for following the City-approved management plan that the CUP required.

7.    The City's arbitrary and discriminatory revocation of Lighthouse's conditional use permit was unconstitutional. It destroyed a vested property right, crippled Lighthouse's ability to serve thousands of low-income and homeless residents, and inflicted severe financial and operational harm—all because a few politically connected neighbors objected to Lighthouse's mission.

8.    Lighthouse brings this case to invalidate the City's revocation of its CUP. The City cannot weaponize its land-use authority to extinguish a vested property right in response to political pressure. Lighthouse seeks restoration of its CUP and damages for the significant harms it has suffered.

9.    In the alternative, Lighthouse seeks just compensation under the Takings Clause if the City's revocation is deemed an exercise of eminent domain for a public use.

**JURISDICTION AND VENUE**

10.    Plaintiff Lighthouse is suing under the Fifth and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

COMPLAINT - 4

11.   This Court has federal-question jurisdiction, 28 U.S.C. § 1331, and civil-rights jurisdiction, 28 U.S.C. § 1343.

12.   Venue lies in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in the City of Wenatchee, Chelan County, Washington State.

## THE PARTIES

13.   Plaintiff Lighthouse Christian Ministries is a 501(c)(3) charity organized as a "charitable organization" under the laws of the State of Washington. It is in good standing. Its principal address is 410 South Columbia Street, Wenatchee, WA 98801-3032.

14.   Defendant City of Wenatchee is a municipality in Chelan County organized under the laws of the State of Washington.

# FACTUAL ALLEGATIONS

## I.     Lighthouse emerged as a critical community resource and worked to expand responsibly.

15.     A nondenominational Christian organization, Lighthouse was founded in 2009 in Wenatchee, Washington, during the "Great Recession" to provide a soup kitchen for homeless and low-income residents.[1]

16.     Lighthouse initially opened its soup kitchen in a one-room downtown storefront on Wenatchee Avenue—one of the three "Main Street" throughfares in Wenatchee.

17.     Lighthouse leased the room from which it operated its soup kitchen on Wenatchee Avenue.

18.     From that single room, Lighthouse received, stored, cooked, and served food to Wenatchee's most vulnerable residents for nearly 10 years.

19.     But a few years after Lighthouse opened its soup kitchen, demand for its services rapidly outstripped its modest facility. By 2015, it had served more than

---

[1] In addition to the soup kitchen that is the focus of this case, Lighthouse operates transitional housing in separate men's and women's group homes called Grace House, Mission House, and Gospel House. These group homes are not part of this case.

COMPLAINT - 6

125,000 servings per year out of its original location. Unable to store all the food it needed to provide its guests with meal services or accommodate all guests in a single sitting, Lighthouse began to look for a new, larger location.

20.    Eventually, Lighthouse's leadership identified an ideal location for expansion: a warehouse at 410 South Columbia that had originally been used for apple packing was being offered for sale.

21.    The warehouse offered an ideal location because it had several floors with large open spaces and a loading dock that could be used to bring food in and out of the building. The building was also well situated in an industrial zone, which meant that its neighbors are other businesses, social service providers, or industrial operations rather than residences or schools.

22.    The warehouse was close to Lighthouse's original location, about two blocks away. But unlike the original location, the warehouse would provide Lighthouse's soup kitchen services off "Main Street."

23.    410 Columbia Street offered yet another benefit. It was located about 160 feet from the bus transfer station, which would allow low-income and homeless guests without cars to more easily access the soup kitchen's services.

24.    Lighthouse's leadership had a vision for the new location. Lighthouse could use the warehouse to provide an integrated food-services distribution system and community for Wenatchee's most vulnerable. The large basement could be

configured for food delivery and storage. And part of that storage could be set up as a food pantry that low-income folks could use to obtain "take away" items. The second floor could be a commercial kitchen with a dining room, office space, and meeting rooms. The third floor would offer a large space for public gatherings, including worship.

25.    Recognizing that low-income and homeless individuals often desperately needed medical care, Lighthouse intended to relocate a nonprofit clinic it operated to the new warehouse location. This clinic served uninsured and under-insured residents of Wenatchee.

26.    Although Lighthouse did not need any special zoning permission from the City when it opened its original location in 2009, the City had since amended its zoning code. A new location for the soup kitchen required a conditional use permit (CUP) for a "Humanitarian service and shelter facility." Wenatchee, Wa. City Code § 10.08.075.

27.    Therefore, before purchasing 410 South Columbia, Lighthouse's leadership reached out to the City to learn what it needed to do to secure a CUP.

28.    On August 20, 2015, Lighthouse staff met with City staff for a "pre-application"—a meeting that a potential CUP applicant must complete before applying for a permit.

29.    After that meeting, Lighthouse worked diligently to develop its plans for renovating the warehouse and prepare its CUP application materials, investing thousands of dollars. After all, Lighthouse's only reason for investing in the warehouse was to run a soup kitchen. To do so, it needed to be confident that it would get a CUP.

**II.    Lighthouse obtained a CUP that ran with the land before investing millions of dollars.**

30.    Less than two weeks after it purchased the warehouse, on November 17, 2015, Lighthouse submitted its CUP application for 410 South Columbia, paying a $1,150 fee.

31.    Among other things, Lighthouse's CUP application described the extensive renovations Lighthouse planned to make to the warehouse and the soup kitchen's intended operations.

32.    Lighthouse's application expressly stated that Lighthouse was reluctant to renovate the warehouse and make a large investment if the use of its building could be taken away. It sought a CUP that would be permanent, barring an egregious misuse of its property.

33.    Lighthouse's CUP application highlighted that the City of Wenatchee was currently working on a renewal effort for the south Wenatchee area. One of the concerns discussed as part of the renewal effort was the number of homeless people on Wenatchee Avenue. Although Lighthouse explained that homelessness is not

caused by social services but by drugs, alcohol, mental illness, and generational poverty, Lighthouse stated that it believed moving its services off Wenatchee Avenue to South Columbia, as well as renovating the warehouse, would serve the city's renewal goals and benefit the broader community.

34.     In its application, Lighthouse detailed its efforts to be a good neighbor at its then-current location on Wenatchee Avenue: It worked diligently to develop relationships with neighboring businesses and local law enforcement agencies. It picked up trash in the surrounding neighborhood on a weekly basis. It shoveled snow for neighboring businesses, swept sidewalks, and pressure washed surrounding buildings, all in an effort to be a good neighbor. Lighthouse also provided the phone numbers of staff to neighboring businesses to call day or night if the soup kitchen's guests caused any problems. It explained that it had limited the hours of some of its social services to mitigate impacts to local businesses. Finally, Lighthouse and its staff fully cooperated with and supported local law enforcement operations when its guests were involved.

35.     Lighthouse's CUP application also provided a parking plan and accounted for how guests would access its facility.

36.     After reviewing Lighthouse's initial application, City staff asked Lighthouse to identify how it would mitigate its impact on surrounding properties.

37.    Lighthouse promised that it would install security cameras, and that footage from those cameras would be accessible to Lighthouse staff and the Wenatchee Police Department. Lighthouse also promised to install lighting in its parking lot and along walkways, and install a six-foot chain-link fence around the property with a gate at the parking lot's entrance.

38.    After receiving the supplement, City planning staff recommended that Lighthouse's CUP application be approved with a condition that Lighthouse provide the City with a management plan identifying how off-site impacts will be prevented and how complaints from neighbors would be addressed before it could get a building permit for the renovations.

39.    Under Wenatchee's ordinances, a hearing examiner reviews CUP applications with staff recommendation and decides whether to grant a CUP in a quasi-judicial hearing. Wenatchee City Code § 10.65.070.

40.    City ordinances require the hearing examiner to evaluate seven general criteria in considering a CUP application, which can be summarized as: (1) requirements of the use can be satisfied; (2) requirement of the zoning district can be met; (3) the requirements of the larger Wenatchee code can be satisfied; (4) the proposal is compatible with adjacent uses; (5) no nuisances will result; (6) no undue impacts on public health, safety, or welfare; and (7) compatibility with the comprehensive plan. *Id.* § 10.65.060.

41.    The Wenatchee hearing examiner conducted a public hearing on Lighthouse's CUP on February 23, 2016.

42.    On February 29, 2016, the hearing examiner granted Lighthouse's CUP application and issued a seven-page decision with findings of fact, conclusions of law, and conditions of approval.

43.    Among other things, the hearing examiner issued factual findings that Lighthouse's proposed use of its property was appropriate for the land use designation in which the property was located and that the proposed use would not cause significant impacts on human or natural environments that could not be mitigated by conditions of approval.

44.    The hearing examiner's conclusions of law included that Lighthouse's conditional use permit would run with the land; the proposed use was consistent with Wenatchee City Code and Comprehensive Plan; the proposed use would not be significantly detrimental to the public health, safety, and welfare, diminish the value of nearby properties, or disturb persons in the use of property unless the conditional use is a public necessity; as conditioned, the proposed use was designed to minimize adverse effects on neighboring properties; the conditions of approval were measurable and could be enforced and monitored; and public use and interests would be served by approval of the CUP.

45.    The hearing examiner's approval of Lighthouse's CUP was subject to 14 conditions of approval:

1.    All conditions are imposed by the CUP are "binding on the 'Applicant,' which terms shall include the owner or owners of the property, heirs, assigns and successors."

2.    "The project shall proceed in substantial conformance with the plans and application materials on file except as amended by the conditions herein."

3.    "The applicant is responsible for compliance with all applicable local, state and federal rules and regulations, and it must obtain all appropriate permits and approvals."

4.    "Any lighting associated with the completed project shall not be installed to shine on adjoining properties."

5.    "Verification of compliance of the applicable standards and the recommended conditions of approval within the City of Wenatchee Development Review Engineer's report prepared by Donald Nelson, dated December 28, 2015 prior to the issuance of final occupancies for the building."

COMPLAINT - 13

6. "Any work or improvements in the public right-of-way shall require review and approval by the City of Wenatchee Public Works Department."

7. The CUP applies only to 410 S. Columbia Street, identified by Assessor's Parcel No.: 22-20-10-815-280.

8. Lighthouse shall "maintain compliance with the standards of WCC Title 10 Zoning and conditions of the CUP at all times. Violation of the terms of the permit and/or requirements of the WCC not expressly modified by the permit shall be processed as a violation pursuant to WCC Chapter 13.13 Enforcement and Penalties."

9. An application for an amendment to the CUP will be required to provide overnight lodging or accommodations that would be classified as a shelter facility.

10. An application for an amendment to the CUP will be required if the use of the top (third) floor is to be used for any type of public assembly or worship not directly related to the humanitarian services identified in the application.

11. A landscape plan or alternative landscape plan meeting all applicable requirements of WCC 10.62 shall be submitted for review and approval

COMPLAINT - 14

1    for the completion of the commercial building permit process for this

2    proposal.

3    12. "Hours of operation shall be maintained as identified in the application

4    materials."

5    13. "A management plan identifying potential off-site impacts from the

6    facility, specific prevention to the City of Wenatchee Community and

7    Economic Development staff for review and approval prior to the

8    issuance of a commercial building permit for the subject property. The

9    management plan must specifically address WCC Sections

10    10.65.060(5) and (6). A LINK Representative will be allowed to

11    participate in this process, but ultimately it is an agreement whose terms

12    will be decided by the City and the applicant."

13    14. "A substantial increase in documented nuisance complaints that are not

14    resolved by the applicant's management plan, from the public and/or

15    nearby properties in or adjacent to the block on S. Columbia Street and

16    S. Wenatchee Avenue containing the subject property will be reviewed

17    for the compliance with WCC Section 10.65.050 and Title 16."

18    **III.    Lighthouse met all CUP and City requirements, completed $1.7 million in renovations, and received the City's approval to open its soup kitchen.**

19

    46.    As required by condition #13 of its CUP, Lighthouse submitted a

management plan to the City on August 13, 2016.

COMPLAINT - 15

47.     In its management plan, Lighthouse explained that it would "continue to monitor and care for the activities of our clients receiving our services" by taking four escalating steps in response to negative guest behavior: (1) verbal warning; (2) removal from services for a day; (3) removal from services for a week or month; and (4) permanent removal from services with "police notification that if they return to the property trespassing charges will follow."

48.     Lighthouse's management plan reflected the fact that all it could do to manage the behavior of its guests was to restrict access to Lighthouse's property.

49.     Beyond restricting access to its property, Lighthouse had no formal authority or practical ability to control homeless people once they were off Lighthouse's property.

50.     The CUP did not require, and could not have required, Lighthouse to assume responsibility for the behavior of homeless people, all of whom are grown adults, off its property.

51.     The management plan required by the CUP expressly contemplated Lighthouse working with the Wenatchee police to exclude uncooperative guests from Lighthouse's property.

52.     Both at its original location and later at 410 South Columbia, Lighthouse's soup kitchen was "low barrier." That means the soup kitchen did not do drug or alcohol testing. Nor did it require guests to show identification. There

COMPLAINT - 16

were no criminal background checks. Nor was there a worship or other religious requirement for the soup kitchen's services.

53.    The soup kitchen served a community of homeless and low-income people that included those who were addicted to drugs or alcohol or who suffered from mental illness.

54.    At all times before, during, and after the CUP application process, Lighthouse and the City understood that Lighthouse's work serving the homeless population would present continuous challenges because homeless people are often struggling with addiction, mental health issues, medical issues, and the acute stress of living on the streets.

55.    Homelessness and its effects on homeless individuals and the community at large are chronic problems to be managed by many groups and individuals, from the homeless themselves, to first responders like the police and paramedics, to mental health providers, to soup kitchens and shelters, to churches and charities, to psychiatric facilities, to drug and alcohol rehab centers, and to volunteers who lend their time, labor, and money.

56.    The City cannot realistically eradicate homelessness and hunger in Wenatchee. If it could, it would have done so.

57.    Lighthouse could not and cannot realistically eradicate homelessness and hunger in Wenatchee. If it could, it would have done so.

COMPLAINT - 17

58. After reviewing Lighthouse's management plan, the City issued Lighthouse a commercial building permit on September 9, 2016.

59. In issuing the commercial building permit, the City approved Lighthouse's management plan.

60. Lighthouse raised money for its renovations and prospective operations at 410 South Columbia.

61. The extensive renovations took over three years, from 2016 to 2019, to complete.

62. Lighthouse invested $1,679,000 to renovate the warehouse from the ground up. Among other interior improvements, Lighthouse installed: (a) commercial food storage in the basement with walk-in refrigerators and freezers; (b) a commercial kitchen and dining hall on the main floor; (c) office space and a medical/dental clinic on the main floor; (d) a worship/meeting area on the second floor; (e) an HVAC system; (f) a fire suppression system; and (g) an elevator. On the building's exterior, Lighthouse also: (h) expanded and paved a parking lot; (i) erected fencing; (j) installed lighting; and (k) invested in landscaping.

63. On July 19, 2019, the City issued Lighthouse a certificate of occupancy for 410 South Columbia Street.

64. The fact that the City issued Lighthouse its certificate of occupancy meant that the City concluded that Lighthouse met all conditions of its CUP that

were prerequisites to the soup kitchen opening its doors—such as the fulfillment of engineering conditions (condition #5) and approval of a landscape plan (condition #11).

**IV.    Lighthouse used its property to provide a vital, City-supported hub for serving Wenatchee's most vulnerable.**

65.    In the summer of 2019, Lighthouse began operating its soup kitchen out of the former warehouse at 410 South Columbia Street.

66.    Lighthouse obtained food for the soup kitchen through monetary and food donations. It maintained relationships with local providers, including large grocery stores like Costco and Safeway. Restaurants also provided food.

67.    Lighthouse also established a relationship with Second Harvest, which gathers surplus food from different businesses and farms, and distributes that food to nonprofits like soup kitchens and homeless shelters.

68.    Every shelter and low-income housing provider in the area relied on Lighthouse's soup kitchen. Law enforcement would refer people to the soup kitchen and even bring them there for a meal.

69.    Churches, nonprofits, government agencies, and others helping low-income and homeless people regularly referred hungry people to the soup kitchen.

70.    Although its focus was providing daily meals, Lighthouse endeavored to be a resource to both the people it served and the broader community.

COMPLAINT - 19

71.    For a few years, before closing during the COVID-19 pandemic, a dental clinic operated from a portion of Lighthouse's property. The external entrance of the clinic required patients to enter the building via stairs or call ahead of time to be escorted in.

72.    Neither Lighthouse nor the dental clinic ever received any complaints or citations about its stair-based entrance for the clinic.

73.    The soup kitchen provided a warm, safe place for people to be during its daily operating hours. Vulnerable people, especially women, could find a refuge. People who were unwelcome everywhere else could use the restroom.

74.    Guests without phones or mailing addresses would list phone numbers from the soup kitchen and its staff as the way to contact them.

75.    Other nonprofits and governmental organizations would visit the soup kitchen during mealtimes to connect with and check on the people they served. Those organizations would also send the people to the soup kitchen for meals and community.

76.    Lighthouse also hosted quarterly resource fairs at the soup kitchen. The resource fairs were set up in the dining hall. Representatives from different nonprofits and governmental organizations, which provided services such as housing or substance-abuse rehabilitation, would help people connect with the services they needed.

77.    Chelan County employees sent out emails to the community advertising the soup kitchen's resource fair events and encouraging agencies to participate. County employees participated, too.

78.    The soup kitchen operated with only a handful of employees, increasing its staff from two to five over time.

79.    The soup kitchen primarily depended on hundreds of local volunteers, many of whom brought their entire families to participate, and many of whom had been former clients of Lighthouse who returned to the kitchen to give back.

80.    Lighthouse's soup kitchen also served as a host site for interns from Service Alternatives, which places individuals receiving Temporary Assistance for Needy Families (TANF) in positions that will enable them to gain job experience and skills while satisfying TANF's work requirement.

81.    On October 24, 2021, Lighthouse completed the purchase of 410 South Columbia, which it now owns free and clear of any debt.

82.    Lighthouse paid off the mortgage on the building with the belief that 410 South Columbia was going to be the soup kitchen's permanent home.

**V.    Homelessness worsened during the pandemic and fentanyl crisis.**

83.    The COVID-19 pandemic abruptly worsened homelessness in Washington state.

84.    These statewide trends impacted Wenatchee.

COMPLAINT - 21

85.     According to the St. Louis Federal Reserve Bank housing market data, the price of housing in Wenatchee nearly doubled between when the soup kitchen opened in 2019 and when the City shut it down in 2025.

86.     That near doubling is confirmed by Redfin data, showing the average Wenatchee home price climbing from $320,000 in December 2020 to $600,000 in September 2025.

87.     According to the Wenatchee Chamber of Commerce, the population of Wenatchee increased between seven and eight percent each year between December 2020 and September 2025, which drove up housing prices.

88.     There has also been a sharp increase in abuse of the synthetic opioid fentanyl in Washington state and the nation as a whole.

89.     According to the Chelan County Coroner's Office, annual drug overdose deaths increased by over 400 percent from the 2019-2021 period to the 2022-2024 period.

90.     The increased use of fentanyl among drug addicts has increased the amount of problematic behavior by drug addicts, including homeless drug addicts.

91.     Lighthouse never allowed the consumption of drugs or alcohol on the premises.

92.     Sometimes guests would use drugs or alcohol offsite.

**COMPLAINT - 22**

93.    Intoxicated guests who could not control themselves would not be admitted.

## VI.    Lighthouse followed its City-approved management plan and did even more.

94.    Between its 2019 opening and being shut down by the City, Lighthouse consistently followed its four-step management plan to address problematic behavior by its guests.

95.    Lighthouse regularly excluded and worked with the police to trespass guests for misbehavior.

96.    Lighthouse did not tolerate misbehavior by its guests on its property or elsewhere.

97.    As reflected in calls for emergency services, Lighthouse called for police or ambulance services when the situation required.

98.    As reflected in its calls for emergency services, Lighthouse called the police for trespassing charges when former guests who had been permanently removed from Lighthouse's services returned to the property.

99.    Low-income housing providers and homeless shelters in the greater Wenatchee area relied on Lighthouse's soup kitchen.

100.    Though not required by the CUP management plan, Lighthouse staff and volunteers patrolled the neighborhood weekly, picking up litter and erasing graffiti, regardless of whether there was any connection to the soup kitchen.

COMPLAINT - 23

101.   Nearby businesses had the Lighthouse director's cell phone number and could call or message to notify Lighthouse about any problem. Lighthouse promptly responded to such calls and messages and did what it lawfully could do, always acting according to its management plan.

102.   Lighthouse required guests to line up in an orderly manner on the sidewalk while waiting for the soup kitchen to open. Lighthouse only allowed this line to form shortly before it opened for meals.

103.   Lighthouse forbade homeless residents from sleeping on its property or erecting tents in the vicinity.

104.   When Lighthouse learned that guests were using a seemingly public, but in fact private, alley owned by neighbors to walk to the soup kitchen, Lighthouse spent $5,000 installing a motorized gate to stop foot traffic. This was not required by the CUP management plan.

105.   Lighthouse met its required off-street parking obligation.

106.   However, in an effort to be a good neighbor, Lighthouse sought to carefully manage overflow parking and minimize street parking, which is legal on the public streets surrounding Lighthouse's property. When the immediately adjacent property, 430 Columbia Street, became available, Lighthouse leased it to park its trucks so that guests would not occupy spaces on the street.

107.   430 Columbia Street, the parking lot next door to Lighthouse's property, is zoned as South Wenatchee Business District.

108.   Parking is a permitted use for South Wenatchee Business District that does not require a conditional use permit.

109.   Grace City Church previously leased 430 Columbia Street for parking.

110.   On information and belief, the City never cited or penalized Grace City Church or the owner of 430 Columbia Street for using the property as a private parking lot.

111.   Lighthouse regularly worked with the City's homeless-services administrator, Josh Mathena, to address issues concerning the homeless population. Lighthouse's then-executive director, Shawn Arington, would have one-on-one meetings with Josh to discuss homeless issues in the community and specific individuals.

112.   Josh would text Shawn if he believed the homeless were misbehaving in a way that Lighthouse could assist.

113.   For example, Josh would text Shawn if he learned, via a complaint or otherwise, that someone had left litter on a neighbor's property. Shawn would respond to Josh's texts as soon as possible. He always ensured that Lighthouse staff or its guests cleaned up the problem.

COMPLAINT - 25

114.   Josh contacted Shawn about problems caused by the homeless in the broader community. When homeless were loitering under a bridge that was in another part of Wenatchee than the soup kitchen, for example, Josh notified Shawn and Shawn encouraged the homeless to disperse or otherwise be denied access to the soup kitchen.

115.   Shawn would notify Josh when Lighthouse excluded guests from its services that he believed Josh knew from his work with the homeless or low-income community.

116.   Josh would ask Shawn to grant individuals previously excluded from the soup kitchen to be allowed to return to the soup kitchen. After conversations with Josh, Lighthouse would sometimes grant these requests from the City.

117.   In taking extra steps such as conducting clean-up patrols, building fencing and gates, and obtaining extra parking, Lighthouse was not conceding that its guests had an undue impact on neighboring properties beyond what the CUP process contemplated. Instead, these steps represent Lighthouse's efforts to go above and beyond its minimum obligations to help the needy while minimizing the effects of homelessness.

**VII.  Lighthouse closed for five weeks in spring 2025 to improve.**

118.  Lighthouse closed temporarily between March 5 and April 7, 2025, to implement a series of changes intended to improve its ability to help its guests, especially in light of persistent problems related to the fentanyl crisis.

119.  First, Lighthouse hired a third-party consultant to help it implement a case-management system, which included using software called MissionTracker that is specifically designed for nonprofits serving vulnerable communities. The goal of the case management system was to better track guests, identify what other resources they were using, and what steps they were taking to improve their personal situations.

120.  The goal of Lighthouse's new case management system was to better hold guests accountable so that they would take steps to address their substance abuse and homelessness.

121.  Through the new case management system and the corresponding software, Lighthouse had the ability to link each guest to resources that best suited their needs, set specific goals (educational, vocational, housing, substance abuse, mental health, etc.), and then track their progress.

122.  Second, Lighthouse reconfigured how guests accessed the soup kitchen's meal services. Before, guests had been able to walk directly into the dining room. After the improvements, Lighthouse would require its guests to enter the

building through the entrance of the space designed for a medical/dental clinic. That entrance offered a lobby area that Lighthouse would use to require guests to sign-in and complete a screening process before accessing the soup kitchen's meals. And by having guests enter through a lobby, Lighthouse could more easily exclude guests for bad behavior.

123.    Because the former clinic entrance had stairs, Lighthouse installed a button for guests with disabilities, who would then be escorted in via the old entrance, which had wheelchair access.

124.    Third, with the new case management system and the reconfigured entrance, Lighthouse would require identification. Identification could be something official like a driver's license, or it could be something issued by another nonprofit or even Lighthouse itself. The idea was to have a way of verifying who the guests were so that Lighthouse could better help them improve their personal situations.

125.    Fourth, Lighthouse instituted a policy to encourage guests to take personal responsibility to escape poverty. If guests failed to make personal progress toward achieving goals to get back on their feet after two or three months, they would be required to meet with a program manager or the Lighthouse director to get on track. If a guest still failed to make progress after three such meetings, the guest would be excluded from Lighthouse's services.

**COMPLAINT - 28**

126.   Fifth, to highlight the improvements, Lighthouse rebranded its soup kitchen to "Downtown Connections." The idea was to differentiate the downtown soup kitchen from Lighthouse's transitional housing programs and emphasize that the soup kitchen was part of a larger network of nonprofits and government programs.

127.   Although it rebranded its soup kitchen, Lighthouse did not change the services that it provided. Its focus remained on providing meals to the hungry while offering community, both religious and secular, and support to escape poverty.

128.   Lighthouse worked with Josh Mathena, the City homeless-services administrator, throughout the transition to this new system.

129.   Lighthouse staff explained the changes that it was implementing to Josh, and Josh indicated his approval and support for those changes.

130.   During the temporary closure, Josh visited Lighthouse's soup kitchen to meet with staff and learn more specifics about the changes that Lighthouse was implementing. Josh praised Lighthouse for its renewed focus on guest accountability.

131.   During the temporary closure, Josh texted Lighthouse staff to ask if the soup kitchen had reopened. Lighthouse staff indicated that it was still training its staff on the new software and that it would consider reopening once the training was completed.

COMPLAINT - 29

132.   Lighthouse also worked with other social service providers throughout the transition to this new system.

133.   Josh brought contacts from other social service providers to the soup kitchen to help Lighthouse better coordinate with those providers.

134.   Lighthouse invested thousands of dollars into making improvements in the spring of 2025, including paying for the new software and staff retraining.

135.   When Lighthouse reopened in April 2025, it noticed almost immediate benefits from the new case management system, which reduced client conflicts and calls for emergency services, including police visits. The new system helped people identify goals, focus on those goals, and connect with the resources necessary to achieve those goals.

## VIII.  The City revoked the CUP without warning.

136.   On May 12, 2025, the City issued an order revoking Lighthouse's CUP.

137.   The May 12, 2025 revocation order was signed by "Glen A. DeVries, Director of the Department of Community Development." The revocation order was the City's official written policy with respect to Lighthouse. Mr. DeVries is a final policymaker for CUP revocations.

138.   Wenatchee Mayor Mike Poirier was aware of and approved the revocation of Lighthouse CUP via the May 12, 2025 revocation order. Mayor Poirier is a final municipal policymaker when it comes to CUP revocations. Lighthouse used

public records requests to obtain emails to and from the Mayor indicating that he was personally involved in the decision to revoke Lighthouse's CUP.

139. The May 12, 2025 order asserted that Lighthouse violated the conditions in the CUP, provisions of the Wenatchee municipal code, and provisions of the international building code.

140. The May 12, 2025 order did not include supporting evidence of any kind: no documents, no photographs, no declarations or affidavits by any witness.

141. The allegations of the May 12, 2025 order were vague and framed at the highest level of generality. For example, the first alleged violation stated that Lighthouse violated "Condition #2: The project shall proceed in substantial conformance with the plans and application materials on file except as amended by the conditions herein." The May 12, 2025 order then goes on to state that Lighthouse violated Condition #2 in the following way (emphasis in original): "***Violation: Site management has not successfully implemented, addressed, or mitigated impacts to the public, businesses and City Services as documented in increased service calls, code enforcement complaints and WCC [Wenatchee City Code] violations.***"

142. At no point before the May 12, 2025 revocation order had the City warned Lighthouse that the City believed that Lighthouse was in violation of the CUP conditions or any law.

143.   At no point before the May 12, 2025 revocation order had the City issued Lighthouse any citation for violating any provision of the CUP or any law.

144.   At no point before the May 12, 2025 revocation order did the City afford Lighthouse the opportunity to correct any deficiency.

145.   The May 12, 2025 revocation order did not offer Lighthouse the opportunity to correct any alleged deficiency to avoid revocation.

146.   For example, to the extent the City objected to Lighthouse parking vehicles in a leased parking lot next door, the City did not ask Lighthouse simply to stop parking vehicles next door.

147.   The City did not provide Lighthouse with notice of alleged deficiencies or any opportunity to correct those deficiencies even though correction of most of the deficiencies—redesignating the original entrance as the main one, unlocking gates, and not parking vehicles on the leased property—would have been minor and simple, effectively requiring a trivial amount of effort.

148.   To the extent the May 12, 2025 revocation order relied on an alleged increase in complaints about homeless people in the neighborhood, the City did not provide Lighthouse with an opportunity to determine whether the complaints were legitimate or give it an opportunity to address those concerns.

149.   At no point during Lighthouse's temporary closure, during which it was actively working with the City homeless program administrator, did the City inform Lighthouse that it was failing to abide by the conditions of the CUP.

150.   At no point during Lighthouse's temporary closure, during which it was actively working with the City homeless program administrator, did the City inform Lighthouse that its new case management system would violate the conditions of the CUP.

151.   Before the May 12, 2025 revocation order, the City had never revoked a CUP without providing notice of alleged deficiencies and an opportunity to correct.

152.   In revoking Lighthouse's CUP without warning and an opportunity to correct any deficiencies, the City treated Lighthouse differently than other CUP holders. For example, Sage Hills Church, which operates with a CUP, opened a coffee shop on its premises. Upon determining that the CUP did not allow a coffee shop, the City notified the church of the alleged violation. The City did not close down the church.

153.   As soon as it received the May 12, 2025 revocation order, Lighthouse took steps to correct alleged deficiencies. For example, it redesignated the handicapped accessible entrance as its main entrance, and unlocked the gate identified by the City. It took approximately one hour to make these fixes.

**COMPLAINT - 33**

154.   Lighthouse initially believed that the May 12, 2025 revocation order was a mistake. Lighthouse reached out to City staff to discuss or find a way to avoid revocation. City staff refused to discuss the revocation with Lighthouse.

155.   Lighthouse appealed the revocation to the city hearing officer on May 27, 2025, paying $525.00 to the City as required.

156.   But appeal of the revocation was not the only action that Lighthouse took. Just in case the CUP revocation was upheld, Lighthouse filled out the paperwork for a pre-application meeting to learn about the process for getting a new CUP.

157.   On July 10, 2025, City staff held the pre-application meeting for a new CUP with Lighthouse staff and one board member. At the meeting, City staff informed Lighthouse about the City's requirements for Lighthouse to receive a new CUP. Lighthouse staff shared information about the case management system that it had recently implemented and about how it intended to operate if a new CUP was required.

158.   During the July 10th meeting, City staff deliberately avoided commenting on what Lighthouse could do to avoid revocation of the existing permit.

159.   Five days after the pre-application meeting, on July 15, 2025, the City issued a new revocation order. This second revocation order retained the grounds for revocations stated in the May 12, 2025 revocation order but added an additional

COMPLAINT - 34

ground: the new case management system allegedly expanded operations beyond what the CUP authorized.

160.   The July 15, 2025 amended revocation order was also signed by Mr. DeVries in his capacity as final policymaker for City policy with respect to the revocation of Lighthouse's CUP.

161.   The City improperly used information that Lighthouse provided via the preapplication meeting as supplementary grounds for revoking the soup kitchen's CUP.

162.   The second revocation order did not offer Lighthouse the opportunity to avoid revocation by ceasing its new case management system, even though ending the new system and reverting to the prior way of doing things would have been trivially simple and less costly than shutting down the entire soup kitchen.

## IX.    The City staff report deliberately misrepresented the service call data to falsely portray Lighthouse as the source of all service calls.

163.   During the appeal process, on July 25, 2025—ten days after issuing the second revocation order and less than two weeks before the hearing on the revocations—the City produced a staff report explaining the City's reasons for revocation and asking the hearing examiner to uphold the revocation.

164.   The staff report was written after the City issued the second revocation order on July 15, 2025.

165.   At no point before appeal did the City provide its staff report to Lighthouse staff.

166.   Among other things, City staff claimed that Lighthouse's soup kitchen "resulted in offsite impacts from public nuisances, chronic nuisances[,] and littering" that violated City code and resulted in nuisance complaints.

167.   The report pointed to three categories of evidence to support the conclusion the offsite impacts warranted revocation: (1) public service calls concerning the area surrounding Lighthouse's soup kitchen had increased since 2019; (2) surrounding businesses had complained; (3) City's homeless service administrator identified impacts to surrounding businesses caused by people who had used the soup kitchen's services.

168.   City staff claimed that such evidence showed that the soup kitchen failed to carry out its management plan and implement nuisance prevention measures.

169.   The City never identified how Lighthouse failed to carry out any aspect of its management plan. Specifically, the City made no allegation that Lighthouse failed to implement its four-step escalating response to negative client behavior or that Lighthouse failed to take action in response to complaints by neighboring property owners, the public, or city staff.

170.   Rather, the City inappropriately *faulted* Lighthouse for following its management plan, which expressly contemplated calls to the police and the involvement of both the police and fire departments.

171.   Given that the management plan contemplated Lighthouse calling the police when necessary and that Lighthouse served a troubled community, it was foreseeable and inevitable that calls for emergency services would increase when the soup kitchen opened, just as it would be foreseeable and inevitable that a property would have an increase in ambulance visits after a hospital opens.

172.   At all relevant times before its CUP was revoked, Lighthouse followed its City-approved management plans, worked to resolve neighbor complaints, and encouraged its guests to be good citizens both on and off of Lighthouse property. However, Lighthouse cannot control the behavior of its guests when they are offsite. Nor can Lighthouse control the behavior of other community members, housed or homeless, off of Lighthouse's property.

173.   The City identified nuisance behavior related to bodily functions that cannot rationally be attributed to the soup kitchen. The staff report asserts that people have urinated or defecated on property surrounding the soup kitchen. Even if some of these incidents occurred, Lighthouse cannot control that. Bodily functions are basic human needs. The problem of homeless people relieving themselves other than at proper restrooms is a problem endemic to homelessness. Lighthouse did not create

the biological need to have bodily functions. Lighthouse cannot control the fact that there are few public restrooms and few places homeless people are welcome to use the restroom. Lighthouse has restrooms that its guests can use when Lighthouse is open. Lighthouse cannot control what adults do off Lighthouse's property, except exclude people whose antisocial behavior is made known to Lighthouse. The fact that homeless people may relieve themselves inappropriately off Lighthouse's property was not a violation of Lighthouse's management plan. By shutting Lighthouse down, the City has closed one of the few places where homeless people are allowed to use the restrooms.

174.    Further, the City grossly misrepresented the underlying public service call data, and none of the City's conclusions are reliable.

175.    The City identified Rivercom as the source of public service call data. Rivercom is the 911 provider for the City of Wenatchee. None of the exhibits to the staff report include the underlying data from Rivercom.

176.    The staff report does not state who analyzed the Rivercom data or what criteria were used to determine whether an alleged complaint was a nuisance, whether it could be attributed to a soup kitchen guest, or whether the complaint counted as evidence that Lighthouse's management plan was not being implemented.

**COMPLAINT - 38**

177.   Because the City withheld the underlying data from Lighthouse and the hearing examiner prior to the August 2025 hearing, there was no way to assess the accuracy of the charts in the staff report at the hearing.

178.   Lighthouse obtained the underlying data after the hearing examiner's decision via multiple public records requests to Rivercom and the City police department, which produced the data over the course of several months.

179.   The City's portrayal in its staff report of the underlying service call data is false and misleading.

180.   The falsity and misleading nature of the City's data analysis in the staff report was willful and deliberate, the purpose of which was to grossly exaggerate the impact Lighthouse was having on the surrounding area in order to justify revoking Lighthouse's CUP.

181.   The City's deliberately false and misleading portrayal of the underlying service call data requires a complete rejection of all the City's assertions based on the data.

182.   The following are examples of how the City deliberately misled Lighthouse and the Hearing Examiner. This is not an exclusive list of examples. These are a small subset of examples of the staff report's misuse of data. Based on the databases Lighthouse obtained via public records request, the underlying data cumulatively involves thousands of service calls coded in different ways in different

databases. It is not practical to analyze the data from every angle in this complaint. The following examples simply illustrate the comprehensive failure of the staff report, and the City as a whole, to honestly represent the data it relied on to revoke Lighthouse's CUP.

183.    The City has a pie chart on page 7 of the staff report indicating that it analyzed 2,600 service calls for the period when Lighthouse was open between 2019 and 2025. According to this pie chart, 27 percent of calls came from Lighthouse itself whereas 73 percent came from areas surrounding Lighthouse.

184.    These 2,600 services calls are based on a database that Lighthouse obtained via a public records request. The database is titled "2019 to date with corrected geo base address" (Corrected Calls Database). The Corrected Calls Database has 7,184 service calls in the vicinity of Lighthouse.

185.    The staff report did not use all 7,185 service calls in the Corrected Calls Database. The staff report used approximately 2,600 without any explanation as to why it included some calls and not others.

186.    The 2,600 service calls are calls from within four "quadrants" that the staff report identifies on page 13. Lighthouse itself is inside quadrant 1. Lighthouse looked at all 7,185 service calls in the Corrected Calls Database and identified 701 service calls made for the Lighthouse property itself (410 South Columbia) and 1,923 service calls within the four quadrants that concerned a location other than

COMPLAINT - 40

1    Lighthouse (off site). This breaks down to approximately 27 percent of service calls

2    for the Lighthouse property and 73 percent for locations in the four quadrants other

3    than Lighthouse. This is how Lighthouse knows that the Corrected Calls Database

4    is the source of the pie chart on page seven of the staff report.

5        187.    The staff report attributes *all* of the service calls in the four quadrants

6    to Lighthouse. In other words, the staff report holds Lighthouse responsible for the

7    1,923 service calls within the four quadrants that were not service calls to the

8    Lighthouse property itself. It is demonstrably false that all of these 1,923 service

9    calls within the four quadrants are attributable to Lighthouse. The exact opposite is

10    true. Literally none of the 1,923 service calls in the four quadrants can be definitively

11    attributed to Lighthouse guests, and much less can any call be attributed to a failure

12    of Lighthouse itself to follow its management plan.

13        188.    The misrepresentation of data in the staff report is so egregious that the

14    only plausible explanation is a deliberate decision to misrepresent the data to

15    Lighthouse, to the Hearing Examiner, and to the general public in order to justify

16    revoking Lighthouse's CUP. The City knew that the underlying data did not support

17    the allegations that the staff report made against Lighthouse or the conclusions the

18    staff report drew with respect to Lighthouse.

19

COMPLAINT - 41

189.   The actual purpose for misrepresenting the service call data was to fabricate a justification for getting rid of the soup kitchen to appease politically connected business owners.

190.   The staff report is addressed directly to the Hearing Examiner. The staff report's specific purpose was to convince the Hearing Examiner that Lighthouse was having a negative effect on the surrounding area. The falsehoods and misrepresentations in the staff report convinced the Hearing Examiner to affirm the revocation order when that would not have happened had the staff report not misrepresented the service call data.

191.   For example, the Corrected Calls Database contains 103 calls for the intersection of Wenatchee Avenue and Spokane Street. Of those, 56 were related to traffic at this busy downtown intersection (DUI, hazard in the road, motor vehicle accidents, parking violations). In other words, over 50 percent of the service calls at this intersection couldn't possibly have anything to do with Lighthouse, yet by lumping these 103 calls at the corner of Wenatchee and Spokane into the 1,923 calls in the four quadrants, the staff report is blaming Lighthouse for things like car accidents at a busy intersection. And in blaming Lighthouse for random car accidents at a busy intersection, the staff report justifies revoking Lighthouse's CUP in part for the illogical reason that random people crashed into each other at Wenatchee and Spokane.

COMPLAINT - 42

192.   The staff report never reveals any of this blatant data manipulation in the staff report, the City never revealed this manipulation to Lighthouse or the Hearing Examiner, and no one would know about it if Lighthouse had not used public records requests to get the underlying data.

193.   But the problems with the City's data presentation go beyond holding all traffic calls against Lighthouse. Of the remaining 48 service calls for the intersection of Wenatchee Avenue and Spokane Street, 16 (one third) are for welfare checks. In other words, a human being was possibly in trouble at a busy downtown intersection. There is no evidence that any of these people in trouble were related to Lighthouse. Nor any evidence that Lighthouse, which simply feeds the poor, could have caused someone to need a welfare check or that the welfare check was the result of Lighthouse not implementing its management plan.

194.   Other service calls to the intersection are just as ambiguous, with the calls variously coded as "suspicious" or "warrant" or "court ordered violation." There is no way to know if there was a suspicious person in reality or if someone arrested for a warrant was a Lighthouse guest (or simply the driver of a crashed car). There is no reason to believe that Lighthouse's failure to implement its management plan *caused* a service call to the intersection of Wenatchee and Spokane because of, for example, suspicion that someone was violating some court order.

COMPLAINT - 43

195.   Overall, of the 103 service calls to this intersection, there is not enough information in the Corrected Calls Database to attribute even a single call to Lighthouse.

196.   This last point—that not even 1 of 103 service calls at Wenatchee Avenue and Spokane Street can be attributed to Lighthouse—is a problem that pervades all of the City's data. Other than the 701 calls made by Lighthouse itself, none of the other 1,923 service calls in the four quadrants can be attributed to Lighthouse. There is no way to know if any service call resulted in the discovery of an actual problem. For example, any random "trespass" call at some property in the four quadrants could have just been a mistake, and the supposed trespasser could have been a new employee. Nor is there any way to tell whether a call, even if assumed real, involved a guest of Lighthouse. Nor is there any way to tell whether a service call—assuming there was a factual basis for it and it involved a Lighthouse guest—was the result of Lighthouse failing to implement its management system. The staff report just crudely attributes all service calls in the four quadrants to Lighthouse and depicts each service call as a failure by Lighthouse to implement its management system. There is no basis in the data for any of the conclusions the staff report draws.

197.   Lighthouse is not cherry-picking the data. Take another intersection, this one at Kittitas Street and Wenatchee Avenue, which is also inside the four

quadrants. It had 101 service calls. The staff report blames all 101 calls on Lighthouse by lumping these 101 calls at the corner of Kittitas and Wenatchee into the 1,923 service calls within the four quadrants that the staff report attributes to Lighthouse. Of these 101 service calls, 51 service calls were traffic-related (again, over half of the service calls, on their face, have nothing to do with Lighthouse). Of the remaining 50 service calls, not a single one can definitively be attributed to Lighthouse, much less that Lighthouse caused the service call by failing to implement its management plan.

198.   The arbitrariness of the staff report becomes even more evident if you walk one block west to the intersection of Kittitas Street and Mission Avenue. This intersection is NOT in the four quadrants. According to the Corrected Calls Database, that intersection had 153 service calls. If 153 service calls to Kittitas and Mission is just a normal downtown intersection, why is the staff report treating 101 calls at the intersection of Kittitas and Wenatchee in the four quadrants as a crisis caused by Lighthouse (which, again, did not cause the calls at that intersection in the first place)?

199.   Or consider two properties on the border of, but not in, the four quadrants: Wally's Tavern and Kaos Nightclub (formerly Nova Nightclub). According to the Collected Calls Database, these two properties at 322 South Wenatchee Street (Wally's) and 212 South Wenatchee Street (Kaos/Nova) had 285

service calls. But in addition to having those calls to the properties themselves, these drinking establishments have customers who leave every day after drinking alcohol. It seems certain that some of those customers who have been consuming alcohol went into the four-quadrant area and generated service calls. But if that happened, as it surely has, the staff report would nevertheless have attributed those service calls to Lighthouse, not the tavern or nightclub. Because, again, the underlying data do not identify whether a service call was legitimate or what the cause was.

200.    One possible destination for inebriated customers of Wally's Tavern and Kaos Nightclub is the public bus interchange at 300 South Columbia Street, which is just a few hundred feet from these bars. That bus interchange is not only a destination for people who have been drinking in a nearby bar, but for countless people who work in South Wenatchee, go out for entertainment, or who simply transfer from one bus to another at the interchange. That interchange is in the four quadrants. According to the Corrected Calls Database, there were 438 requests for service to the bus stop. By including these 438 service calls in the 1,923 service calls in the four quadrants, the staff report attributes literally every single one of these requests for service to Lighthouse, even though the bus interchange serves everyone in Wenatchee. It is not remotely plausible that a Lighthouse guest is the cause of literally every single call for service at Wenatchee's major public bus interchange.

1   Nor is it remotely plausible that every single service call to the bus stop is the result

2   of Lighthouse failing to implement its management plan.

3       201.   Another example of arbitrariness is a railway underpass. According to

4   the Corrected Calls Database, the railway underpass on Thurston Street generated

5   141 service calls. That location is inside the four quadrants. A mere 250 feet away

6   is the intersection of Thurston Street and Worthen Street, which generated 74 service

7   calls. That intersection is outside of the four quadrants. So all 141 service calls for

8   the underpass, but none of the 74 calls from the intersection a 45 second walk away,

9   are attributed to Lighthouse. That is arbitrary.

10      202.   Or consider zooming in even closer to La Mexicana, a grocery store

11  right next to Lighthouse that serves the Latino community at 421 South Wenatchee

12  Avenue. According to the Corrected Calls Database, La Mexicana had 186 service

13  calls. 25 service calls were for theft or forgery. It isn't plausible that the only calls

14  for theft or forgery at a busy grocery store were due to Lighthouse guests. 30 service

15  calls were labeled "alarm" but all 30 of those calls were between September 2021

16  and September 2024, suggesting that La Mexicana used a security system for three

17  years that generated 30 alarm calls for whatever reason. There is no indication that

18  the alarms were real (as opposed to false alarms) or tied to any Lighthouse guest. 52

19  service calls were for trespass, but none of those 52 calls indicate that the subject of

    the trespass call was from Lighthouse. In any case, 52 trespass calls in six years is

COMPLAINT - 47

fewer than one per month. That is trivial for a busy grocery store that serves hundreds of (perhaps more than 1,000) customers every day and is directly next door to a soup kitchen serving thousands of meals per month.

203.   The arbitrariness gets even worse if one zooms out. Lighthouse used a public records request to obtain another database of service calls for the vicinity around Lighthouse. This database is called the "2019 to date radius 1320 ft 410 S Columbia" (Radius Database). This database has service calls to all locations within 1,320 feet (approximately a quarter mile) of Lighthouse during the time it was open from 2019 to 2025 *except* service calls for locations within the four quadrants. In other words, if the quarter mile around Lighthouse is imagined as a donut, the four quadrants are the donut hole and everything else is the donut itself around the hole. According to the Radius Database, there were 3,006 service calls in the donut but not the hole (i.e., within a quarter mile of Lighthouse but outside the four quadrants). (Strictly speaking, the database has 3,201 entries, but Lighthouse determined that 194 calls were within the four quadrants, so, subtracting those, the correct number is 3,006.) This large number of service calls just outside the four quadrants (3,006) illustrates that there is nothing special about the four quadrants (1,923 calls were made to a location other than Lighthouse). A lot of service calls are the norm for a busy downtown.

204.   The staff report also never reveals larger service call trends. Using public records requests, Lighthouse obtained another database called "incident reports 2014-2024" (Incident Reports 2014-2024). By comparing the number of service calls in the Incident Reports 2014-2024 database to the number of service calls for the years 2019-2024 in the Radius Database, it becomes evident that the Incident Reports database contains service calls to the area within a quarter mile of Lighthouse.

205.   The Incident Reports 2014-2024 database does not show alarming trends within a quarter mile of Lighthouse's property when comparing the years before Lighthouse opened and after it opened. This database has four relevant bar graphs at the end that show annual incidents for four broad categories of service calls: Crimes Against People, Crimes Against Society, Nuisance, and Crimes Against Property.

206.   Here is what the bar graphs show when comparing the average annual incidents from 2014-2019 with the average annual incidents from 2019-2024. Lighthouse included 2019 in both sets of averages because Lighthouse opened in mid-2019:

    a. **Crimes Against People**: 2014-2019 average was 38; 2019-2024 average was 20.

b. **Crimes Against Society**: 2014-2019 average was 107; 2019-2024 average was 117.

c. **Nuisance**: 2014-2019 average was 419; 2019-2024 average was 413.

d. **Crimes Against Property**: 2014-2019 average was 332; 2019-2024 average was 357.

207.   In sum, after Lighthouse opened, the average number of crimes against people went down, stayed essentially the same for crimes against society, fell slightly for nuisance, and rose slightly for crimes against property. There is no trend of increased service calls associated with Lighthouse.

208.   It is particularly notable that calls for nuisance—which was the focus of the City's allegations against Lighthouse—decreased after the soup kitchen opened on South Columbia.

209.   The bar graphs in the Incident Reports 2014-2024 database also indicate that 2022 and 2023 were aberrantly high years for crimes against society, nuisance, and crimes against property. 2024 was aberrantly low. The only conclusions that one can draw is that averages remained stable between 2014 and 2024, with unusual increases in 2022 and 2023 and then a well-below-average drop in 2024.

210.   Given the stability in averages for the various categories of service calls when comparing the years before Lighthouse and the years after, Lighthouse did not cause any increase in overall service calls.

211.   The stability in the average annual number of calls also shows that the staff report is egregiously wrong in attributing all service calls in the four quadrants area to Lighthouse. If Lighthouse alone were generating the overwhelming number of service calls to the vicinity around Lighthouse, then the City's own data would show essentially no service calls in the area before Lighthouse opened its soup kitchen on South Columbia. The data do not show that at all. The data show roughly the same number of service calls before and after the soup kitchen opened in the area surrounding Lighthouse.

212.   The staff report also failed to account for broader trends that influence public service call data. The City provided no information about whether public service calls were increasing throughout the City or whether the soup kitchen's presence on South Columbia meant there were fewer public service calls in other locations—such as on Wenatchee Avenue or surrounding parks visited by homeless individuals.

213. Moving on to Lighthouse itself: The underlying data show overwhelmingly that Lighthouse complied with its management plan. Lighthouse obtained public records directly from Rivercom showing the emergency service

dispatch report for each service call to the Lighthouse property or call verifiably associated with the Lighthouse property.

214.    Based on the public records that Lighthouse obtained via its public records requests, there were 882 calls arguably regarding the soup kitchen between mid-2019 when it opened and mid-2025 when the City shut it down. The Corrected Calls Database indicates only 701 calls to Lighthouse's property, but the emergency dispatch calls themselves show a higher number.

215.    Of those 882 calls, 433 (almost exactly half) were directly from soup kitchen staff or the director calling the police to have a guest escorted out, informed that he or she is excluded for a period of time, and told that he or she will be considered a trespasser if he or she returns.

216.    These 433 calls were mandated by the management plan, which required Lighthouse to exclude guests who failed to adhere to the rules. Those calls are evidence of compliance with the management plan, not a failure to adhere to the management plan.

217.    Sometimes these trespass calls from Lighthouse were related to persistently problematic people. In 2024, for example, Lighthouse called police 13 times about one person who had been given a trespass order but who nevertheless kept coming back. In repeatedly calling the police about someone with a trespass order, Lighthouse was complying with the management plan.

COMPLAINT - 52

218.    Of those 882 calls, 15 percent were calls from Lighthouse staff or soup kitchen guests requesting emergency medical services due to an acute medical crisis.

219.    Homeless people have worse physical and mental health than the average person. Homeless people also often have no family members to turn to in times of acute physical and mental illness. Homeless people often rely on emergency services to deal with physical and mental crises.

220.    Calling 911 to seek medical help for someone in acute physical or mental distress did not violate Lighthouse's management plan.

221.    Of those 882 calls, 4.5 percent were related to false alarms triggered by malfunctions, rats, stray cats, or human error.

222.    False alarms related to malfunctions, rats, stray cats, or human error did not violate Lighthouse's management plan.

223.    Of those 882 calls, 18 percent came from Lighthouse guests who called emergency services. Sometimes Lighthouse guests called 911 to report crimes, whether against themselves or others, that occurred elsewhere.

224.    Homeless people experience much higher rates of crime victimhood than average people. Homeless people often must seek the protection of the police.

225.    When homeless people called 911 from Lighthouse to report crimes, that did not violate Lighthouse's management plan.

226.   Of those 882 calls, seven percent were from various sources other than neighbors. For example, sometimes the police would call the 911 dispatch themselves from Lighthouse to note that a reported issue did not exist or had been resolved. Sometimes there were calls that mentioned Lighthouse but did not result in emergency services being dispatched.

X.   **The City revoked the CUP to make some politically connected business owners happy.**

227.   The staff report cited a set of seven emails sent to the Wenatchee mayor over the course of a few days in April 2024.

228.   The real reason for getting rid of the soup kitchen was to appease this group of politically connected business owners who own property in the vicinity of Lighthouse. The manipulation of the underlying data in the staff report is so obvious and the analysis of the staff report so disconnected with reality that the only explanation is a desire to manufacture a justification to get rid of the soup kitchen.

229.   Lighthouse maintained a positive relationship with most of the neighboring property owners and the broader community.

230.   The City's reliance on 2024 complaints failed to account for how Lighthouse responded to public complaints or responded to negative behavior of its guests—a response which included the temporary closure in the spring of 2025.

231.   Indeed, as Josh Mathena, the City's homeless program administrator, stated under the penalty of perjury, Lighthouse was actively "making efforts to

**COMPLAINT - 54**

minimize or eliminate" the impacts of Lighthouse's guests on Lighthouse's neighbors.

232.   On information and belief, this group of disgruntled property owners contained one or two politically powerful individuals who continued to complain to City staff, including the mayor, in 2025.

233.   On information and belief, the City's decision to revoke Lighthouse's CUP was aimed at satisfying those politically powerful squeaky wheels rather than because Lighthouse actually violated any CUP condition or law.

234.   The City could not openly admit that it was revoking Lighthouse's CUP to satisfy a vocal and politically powerful minority, so it manufactured reasons to revoke Lighthouse's CUP—a locked gate, the use of an alternative entrance, attempts to provide additional off-street parking, and the behavior of guests off Lighthouse's property.

235.   None of the City's stated reasons for revoking Lighthouse's CUP justified revoking the CUP, let alone for revoking Lighthouse's CUP without notice and an opportunity to fix the issues.

## XI.   Lighthouse shut down its soup kitchen at great cost and lost valuable food contracts.

236.   Following a decision by the Wenatchee hearing examiner upholding the City's revocation, Lighthouse shut down its soup kitchen.

237.   In doing so, it gave away all its remaining food—perishable, frozen, and pantry items—to other service organizations or members of the community.

238.   Lighthouse also sold or gave away much of its soup kitchen equipment to minimize its costs. For example, it sold one of its delivery trucks rather than allow the truck to sit idle in its parking lot while the nonprofit continued to pay for insurance.

239.   Lighthouse no longer employs personnel devoted to its soup kitchen. The former soup kitchen employees have found or are seeking other positions.

240.   Lighthouse currently pays approximately $5,200 per month in carrying costs for items like insurance, maintenance, utilities, and security for the ownership of its building at 410 South Columbia Street.

241.   Lighthouse had built direct relationships with food providers such as major grocery stores.

242.   Ordinarily, these food providers distributed their excess food by giving it to the nonprofit Second Harvest, which in turn distributes it. Many of Lighthouse's food providers deal only with Second Harvest as a matter of administrative convenience.

243.   Second Harvest has contractual relationships with food providers and community partners like Lighthouse that require it to be the exclusive distributor of

food from providers to community partners. This one-distributor system ensures an orderly and fair distribution of donated food to community partners.

244.   Lighthouse's direct relationships with various food providers were grandfathered in the sense that the providers themselves, Second Harvest, and Lighthouse all agreed that Lighthouse's preexisting relationships could operate outside of Second Harvest's distribution system. If Lighthouse failed to maintain its preexisting relationships, however, it would lose those relationships, and it would be forced to the back of Second Harvest's line to receive donated food.

245.   When Lighthouse was forced to close its soup kitchen due to the loss of its CUP, Lighthouse was forced to terminate its grandfathered relationships with food providers.

246.   If Lighthouse is able to reopen its soup kitchen, it will have to buy all its food until it is eligible to receive food through Second Harvest.

247.   Lighthouse may not be able to obtain food in the same quantities or with the same reliability from the general public market or Second Harvest as compared to the past.

248.   Lighthouse has lost donations due to the shutdown of its soup kitchen, and now its budget is 35 to 40 percent of the number its board usually relies on.

249.   As a 501(c)(3) charity with a specific mission, Lighthouse cannot use its soup kitchen for some profitable business purpose, even if Lighthouse had, which

**COMPLAINT - 57**

1  it does not, the desire, expertise, investment capital, and time to transform 410 South

2  Columbia Street into a business.

3  **INJURY TO PLAINTIFF**

4  250.   The City's revocation of Lighthouse's CUP for its soup kitchen

5  deprived Lighthouse of a permanent, vested property right.

6  251.   But for the CUP revocation, Lighthouse would not have shut down its

7  soup kitchen.

8  252.   But for the CUP revocation, Lighthouse would now be serving meals

9  to the hungry.

10  253.   But for the CUP revocation, Lighthouse would continue to serve as a

11  day shelter in Wenatchee.

12  254.   But for the CUP revocation, Lighthouse would still have valuable

13  contracts with numerous local food vendors.

14  255.   But for the CUP revocation, Lighthouse would not have experienced a

15  reduction in donations.

16  256.   But for the CUP revocation, Lighthouse's soup kitchen would continue

17  to act as a liaison for other services and treatments for the needy in the area.

18  257.   But for the CUP revocation, Lighthouse would be able to put its

19  renovated property at 410 South Columbia to its intended use.

258.   But for the CUP revocation, Lighthouse's soup kitchen would be a place for generous citizens of Wenatchee to help the needy by volunteering at the soup kitchen.

259.   But for the CUP revocation, the homeless and needy in Wenatchee would have a dependable place for nutritious food and contacts with social service providers.

260.   But for the CUP revocation, Lighthouse would not have to try to find other uses for 410 South Columbia.

261.   But for the CUP revocation, Lighthouse would not face the loss of the value of its extensive property renovations.

262.   But for the CUP revocation, Lighthouse would not have to continue to incur the time and expense of maintaining 410 South Columbia—insurance, security, upkeep, utilities—without being able to use the property to advance its mission of feeding the hungry.

263.   But for the CUP revocation and the City's gross misrepresentation of service call data, Lighthouse would not have suffered damage to its reputation among the public and its donors, and subjected its employees, including its former director, to extreme personal stress.

# CONSTITUTIONAL VIOLATIONS

## Claim I, Substantive Due Process Violation

264.  Lighthouse realleges and incorporates by reference the allegations in paragraphs 1 through 263.

265.  Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the City of Wenatchee cannot deprive Lighthouse of "liberty, or property, without due process of law."

266.  Lighthouse has a liberty interest in operating a charitable, noncommercial soup kitchen to provide free meals to those in need.

267.  Lighthouse has property interests in its CUP and in its fee simple ownership of 410 S Columbia St, Wenatchee, WA 98801-3032.

268.  The Due Process Clause of the Fourteenth Amendment has a substantive component. Count I is a claim for substantive due process. It is not a claim for procedural due process.

269.  By revoking the CUP, the City arbitrarily and irrationally deprived Lighthouse of its liberty interest in feeding the needy, of its vested property interest in its CUP, and of its property interest in using 410 S Columbia St, Wenatchee, WA 98801-3032 as a soup kitchen for the needy.

270.   For the violation of its federal substantive due process rights, Lighthouse is seeking compensatory and nominal damages, declaratory relief, and a permanent injunction.

### Claim II, Equal Protection Violation

271.   Lighthouse realleges and incorporates by reference paragraphs 1 through 263.

272.   The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people or entities alike.

273.   Here, Lighthouse is similarly situated to other social-service providers, to other CUP holders in general, and to other property owners that may from time to time commit technical infractions of the zoning code.

274.   The City has singled out Lighthouse for differential treatment in several ways, including but not limited to: (1) failing to notify Lighthouse of alleged violations of the Wenatchee Zoning Code, the CUP, or international building code and working with Lighthouse to remedy the situation short of revocation; (2) revoking a CUP for minor and easily correctable alleged violations such as renting parking spaces next door; (3) failing to give Lighthouse the opportunity to cure its alleged violations when the City gave and continues to give other similar CUP holders opportunities to cure; (4) using Lighthouse's efforts to improve its ability to help its guests by doing things like implementing a new case management

system to expand the City's allegations of Lighthouse's wrongdoing; and (5) expecting Lighthouse to be responsible for the behavior of adults off its property beyond the only incentive at Lighthouse's disposal—excluding people per the management plan.

275.    For the violation of its federal equal protection rights, the Lighthouse soup kitchen is seeking compensatory and nominal damages, declaratory relief, and permanent injunctive relief.

**Count III, Takings Clause Violation**

276.    Lighthouse realleges and incorporates by reference paragraphs 1 through 263.

277.    The Fifth Amendment Takings Clause applies to the City via the Fourteenth Amendment.

278.    Revoking Lighthouse's CUP is a taking of its vested property right that runs with the land.

279.    In being a vested property right running with the land that allows a specific use (operating as a soup kitchen), the CUP is analogous to an easement that allows a specific use, such as utility lines.

280.    The CUP revocation destroyed Lighthouse's real property rights in its CUP.

281.   To the extent that the taking of Lighthouse's CUP is not for a public use, the taking is unconstitutional.

282.   To the extent that the taking of Lighthouse's CUP is for a public use, the City owes Lighthouse just compensation.

283.    For the violation of its rights under the takings clause of the Fifth Amendment, Lighthouse is seeking just compensation, declaratory relief, and permanent injunctive relief.

## PRAYER FOR RELIEF

A.    For an award of compensatory or nominal damages due to the violation of Lighthouse's constitutional rights;

B.    For a judgment declaring that the City violated Lighthouse's constitutional rights;

C.    For a permanent injunction prohibiting the City from enforcing its unlawful revocation of Lighthouse's CUP;

D.    For an award of reasonable attorneys' fees and costs;

E.    For an award of just compensation, in the alternative; and

F.    Such other relief as this Court deems appropriate.

Dated: December 16, 2025                    Respectfully submitted,

Jeff Rowes*                    /s/ Riley Grace Borden
(TX Bar No. 24104956)          Riley Grace Borden
(NY Bar No. 4211991)           (CO Bar No. 59580)
                               (WA Bar No. 62029)

**COMPLAINT - 63**

Christen Hebert*
(TX Bar No. 24099898)
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 970
Austin, TX 78701
(512) 480-5936
jrowes@ij.org
chebert@ij.org

INSTITUTE FOR JUSTICE
600 University Street, Suite 2710
Seattle, WA 98101
(206) 957-1300
reborden@ij.org

*pro hac vice motions to be filed

**COMPLAINT - 64**